UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

JAWAN BOWDEN,

                  Petitioner,              Case No. 1:13-cv-507

v.                                      Honorable Paul L. Maloney

CARMEN PALMER,

                  Respondent.

_____/

**OPINION**

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner is serving a sentence of 12 years to 36 years. The sentence was imposed by the Kalamazoo County Circuit Court on June 21, 2010, after a jury convicted Petitioner of one count of first-degree criminal sexual conduct, MICH. COMP. LAWS § 750.520b.[1] Petitioner was sentenced as an habitual offender, MICH. COMP. LAWS § 769.12. In his *pro se* petition, Petitioner raises six grounds for relief, as follows:

> I.     PETITIONER-DEFENDANT WAS DENIED A FAIR TRIAL BY THE PRESENCE ON THE JURY OF A BIASED JUROR AND DEFENSE TRIAL COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE IN FAILING TO CHALLENGE THIS JUROR FOR CAUSE DUE TO THE JUROR'S CLOSE FRIENDSHIP WITH ONE OF THE TESTIFYING DETECTIVES. US CONST. AM XIV, MICH CONST. ART. 1 § 17.

---

[1] The jury found Petitioner "not guilty" of a second count of first-degree criminal sexual conduct.

II.      PETITIONER-DEFENDANT WAS DENIED A FAIR TRIAL BY THE TESTIMONY OF A NURSE THAT A VAGINAL TEAR ON THE VICTIM COULD ONLY BE CAUSED BY TRAUMA OR INJURY. US CONST. AM XIV; MICH CONST ART I § 17.

III.     PETITIONER-DEFENDANT WAS DENIED A FAIR TRIAL BY THE INTRODUCTION OF HIGHLY INFLAMMATORY VIDEO SURVEIL[L]ANCE TAPES WHICH WERE NOT RELEVANT AND WHICH WERE MORE PREJUDICIAL THAN PROBATIVE. US CONST AM. XIV; MICH CONST. ART. 1 § 17.

IV.     PETITIONER-DEFENDANT WAS DENIED A FAIR TRIAL BY THE ADMISSION OF INADMISSIBLE HEARSAY, NAMELY POLICE TESTIMONY THAT THE VICTIM SAID SHE DID NOT KNOW SHE HAD HAD SEXUAL INTERCOURSE. US CONST. AM XIV; MICH CONST. ART I § 17.

V.      PETITIONER-DEFENDANT WAS DENIED HIS RIGHT OF CONFRONTATION AND A FAIR TRIAL BY THE ADMISSION OF HEARSAY FROM THE INVESTIGATING DETECTIVE THAT SHE HAD DISCOVERED FROM A CO-DEFENDANT THAT DEFENDANT WAS INVOLVED IN THE RAPE. US CONST. AM VI, XIV, MICH CONST. ART. 1 § 17.

VI.     THE TRIAL COURT ABUSED ITS DISCRETION IN SCORING CERTAIN OF THE OFFENSE VARIABLES, REQUIRING THAT PETITIONER DEFENDANT BE RE-SENTENCED.

(Pet., ECF No. 1, PageID.4-7, 9; Attach. 1 to Pet., ECF No. 1-1, PageID.14, 16.)  Respondent has filed a response to the petition (ECF No. 12) stating that the petition should be denied.  Upon review of the pleadings and the record, the Court will deny the petition for failure to raise a meritorious federal claim.

**Procedural History**

A.      **Trial Court Proceedings**

Following a preliminary examination hearing on November 19, 2009, in Michigan's 8th District Court, the court found that on June 9, 2008, Takeshia McCullough had been the victim of first-

- 2 -

degree criminal sexual conduct and that there was probable cause to believe that Petitioner had committed the crime. (PE, ECF No. 14, p. 32.)[2] The court bound Petitioner over to the Kalamazoo County Circuit Court. (*Id.*).

Judge Johnson of the Kalamazoo County Circuit Court presided over Petitioner's seven-day jury trial. At trial, Ms. McCullogh testified that on June 8, 2008, she went to Best Western Hotel near Sprinkle Road in Kalamazoo, Michigan, to go swimming. (TT II, ECF No. 16, pp. 173-175.) She went with Petitioner, a person she thought of as her brother because her mother and Petitioner's father had dated. (TT II, ECF No. 16, pp. 159-60.) Petitioner's brother Dionte; some girls, including a couple of girls Ms. McCollough knew from school; and a few of Petitioner's friends were at the hotel as well. (TT II, ECF No. 16, pp. 173-74, 176.) Petitioner rented a room on the third floor, room 307; Petitioner's brother rented a room on the second floor, room 202. (TT II, ECF NO. 16, p. 181.)

Ms. McCollough swam intermittently during the afternoon and evening until the pool closed at midnight. (TT II, ECF No. 16, pp. 175-80.) After that, she initially spent some time in the second floor room where Petitioner's brother Dionte, Mike McKinley, Christina Lacey, and a couple of other participants were using marijuana. (TT II, ECF NO. 16, pp. 181-83.) Eventually she shifted to the third

---

[2]The Rule 5 materials submitted by Respondent include nine transcripts that shall be referenced herein as follows:

| | |
|---|---|
| November 19, 2009 Preliminary Examination Hearing | (PE, ECF No. 14, p. __) |
| March 30, 2010 Trial Transcript (Volume I) | (TT I, ECF No. 15, p. __) |
| March 31, 2010 Trial Transcript (Volume II) | (TT II, ECF No. 16, p. __) |
| April 1, 2010 Trial Transcript (Volume III) | (TT III, ECF No. 17, p. __) |
| April 13, 2010 Trial Transcript (Volume IV) | (TT IV, ECF No. 18, p. __) |
| April 14, 2010 Trial Transcript (Volume V) | (TT V, ECF No. 19, p. __) |
| April 15, 2010 Trial Transcript (Volume VI) | (TT VI, ECF No. 20, p. __) |
| April 16, 2010 Trial Transcript (Volume VII | (TT VII, ECF No. 21, p. __) |
| June 21, 2010 Sentencing Transcript | (ST II, ECF No. 22, p. __) |

floor room.  In that room, Petitioner, his brother, and Sam Dixison, issued a challenge to see who could drink the most shots of alcohol.  (TT II, ECF No. 16, pp. 185-90.)

Ms. McCollough could not recall how many shots she drank, but when she stopped, she was tired, dizzy, and nauseous.  (TT II, ECF No. 16, p. 191.)  She laid down on the bed to watch television and, apparently, passed out.  (TT II, ECF No. 16, pp. 191-92.)  Ms. McCollough maintained, however, that she had not consented to have sexual intercourse with the Petitioner.  (Id. at p. 192.)  She awoke at 4:30 p.m. on June 9 in the hospital.  (TT II, ECF No. 16, p. 166.)  The prosecutor argued that while she was passed out, Petitioner and his friends had raped her.

The prosecutor presented to Ms. McCullough some discs containing video evidence from the hotel's security cameras.  (TT II, ECF No. 16, pp. 204-05.)  Ms. McCullough had reviewed the videos with the prosecutor before the trial.  (Id.)  The footage offered brief glimpses of the participants as they moved from one room to the other.  Ms. McCullough was able to identify the persons pictured in the videos based on the clothing they wore that evening.  (Id. at pp. 205-07.)

Christina Lacey, a friend of Ms. McCullogh, was at the Best Western that night.  (TT III, ECF No. 17, pp. 60-61.)  Ms. Lacey was in the third floor room when the drinking challenge was issued.  (Id. at pp. 64-66.)  Ms. Lacey said that Ms. McCullough stopped drinking when she was so drunk she was ready to pass out.  (Id. at pp. 66-69.)  Ms. Lacey indicated that Dionte Bowden took Ms. McCullough down to the second floor room and Sam Dixison followed.  (Id. at pp. 69-70.)  After they left, Ms. Lacy heard Petitioner tell Rick Burroughs that Dionte had asked Petitioner to get Ms. McCullough drunk.  (Id. at p. 76.)  She became suspicious and went down to the second floor room.  (Id. at pp. 76-77.)

When she opened the door of the second floor room she saw Sam Dixison, naked from the waist down, standing over Ms. McCullough; she was on the bed and also naked from the waist down. (*Id.* at pp. 78-80.) Ms. Lacey went up to the third floor room to get help. (*Id.* at p. 80.) While she was upstairs, the hotel surveillance video shows Petitioner going into the second floor room where he remained with Ms. McCullough for several minutes. (*Id.* at pp. 81-85.) Ms. Lacey returned to the second floor room and, with the assistance of others, carried the passed-out Ms. McCullough up to the third floor room. (*Id.* at pp. 85-87.)

The group pulled Ms. McCullough into the third floor room, placed her on the bed, and then an argument ensued. (*Id.* at p. 87.) Eventually, Petitioner told everyone to leave the room. (*Id.* at p. 91.) At that time, hotel personnel also informed the group they would have to be quiet or they would have to leave. (*Id.* at p. 92.) The group, with the exception of Ms. McCullough, was in the hallway or the stairwell. (*Id.*) Petitioner indicated he had to go back to the third floor room because he had forgotten something there. (*Id.* at p. 93.)

The hotel surveillance videos show Petitioner's return to the third floor room. (*Id.* at p. 94.) A few minutes later, Rick Burroughs enters the third floor room. (*Id.* at p. 95.) He leaves after a couple of minutes and then an unidentified person enters the room. (*Id.* at p. 96.) Moments later, Petitioner leaves. (*Id.*) Three minutes later, Rick returns to the room. (*Id.* at p. 97.) Rick leaves about eight minutes later, but then returns to the room with another unknown person. (*Id.* at pp. 98-99.) That was how things stood when the video ended. (*Id.* at p. 100.)

Between 4:00 and 4:30 a.m., Ms. Lacey had informed the hotel staffperson what was going on. (*Id.*) She also called her mother. (*Id.*) Her mother called Ms. McCullough's mother. (*Id.*)

Ms. Alicia Thompson testified that she was at the Best Western during the early morning hours of June 9, 2008. (*Id.* at pp. 118-19.) Ms. Thompson was also in the third floor room when Ms. McCullough drank so much that she passed out. (*Id.* at pp. 119-22.) When Ms. Lacey informed Ms. Thompson that she had seen Sam Dixison, naked from the waist down with the passed-out Ms. McCullough in the second floor room, Ms. Lacy went down to the second floor room to see for herself. (*Id.* at p. 126-27.) She knocked on the door. (*Id.* at p. 128.) Eventually, Petitioner answered the door. (*Id.* at p. 129.) Ms. Lacy testified that his shorts appeared as if they had been just put on hastily. (*Id.* at pp. 130-31.) Ms. McCullough was passed out and naked on the bed. (*Id.* at pp. 131-32.)

Ms. Thompson echoed Ms. Lacey's testimony with regard to what followed. They brought Ms. McCullough back to the third floor room and then everyone left the room. (*Id.* at pp. 136-37.) After the group left Ms. McCullough in the room, Petitioner took Ms. Thompson home, but she had to wait for him for about 15 to 20 minutes before he drove her home. (*Id.* at pp. 138-41.) She was unsure what he was doing during that time period. (*Id.*)

Registered nurse Rose Cochran treated Ms. McCullough a couple of hours after she arrived at Bronson Hospital. (*Id.* at p. 172-73.) Nurse Cochran reported that Ms. McCullogh's blood alcohol level was 0.37, based on blood drawn at 5:30 a.m. (*Id.* at p. 184.) Ms. McCullough remained unresponsive while under Nurse Cochran's care, even while a physician performed the tasks required for the "rape kit." (*Id.* at pp. 185-87, 190-93.) With regard to the rectal swab that was taken from Ms. McCullough, Nurse Cochran testified that she did not believe the physician penetrated the anus, but instead simply swabbed around the outside of the anus. (*Id.* at pp. 196-99.) Nurse Cochran testified that Ms.

McCullough had suffered a small cut to her vaginal opening, the sort of injury that might be caused by intercourse or digital penetration. (*Id.* at pp. 187-89.)

Registered nurse Julie Kiel also treated Ms. McCullough at Bronson Hospital. (*Id.* at p. 202.) Nurse Kiel collected blood and urine from Ms. McCullough at the direction of detective Christina Ellis. (*Id.* at p. 203.) Ms. McCullough remained unresponsive until between 3:00 and 4:00 p.m. (*Id.* at p. 208.)

Detective Brett Pittelkow, a police detective for the City of Kalamazoo, testified that he investigated the criminal sexual conduct case involving Ms. McCullough. (TT III, ECF No. 17, pp. 210-11.) He testified that Sam Dixison had admitted having sex with Ms. McCullough that night. (*Id.* at p. 212.) He also noted that Sam Dixison had been convicted of first-degree criminal sexual conduct for his actions with regard to Ms. McCullough. (*Id.*) He took DNA swabs from Mr. Dixison as well as Dionte Bowden, Michael McKinley, and Derrick Burroughs.[3] (*Id.* at p. 214.)

The jury heard testimony from two police evidence technicians regarding gathering of evidence in the two hotel rooms. (TT III, ECF No. 17, pp. 216-38.) The jury also heard testimony from several experts from the Michigan State Police lab. (*See* TT IV, ECF No. 18.) The labwork indicated that Ms. McCullough had a high blood alcohol level (*Id.* at pp. 30, 37-38), but no other drugs in her system (*Id.* at pp. 13-14). It also indicated that the rape kit swabs contained DNA that matched Petitioner's DNA. (*Id.* at pp. 113-16.) A swab taken from the outside of a used condom discovered in one of the hotel rooms also contained DNA, the DNA of more than one person. (*Id.* at p. 124.) The lab identified

---

[3]Petitioner's DNA swab was taken almost two years after the incident. (TT IV, ECF No. 18, pp.183-84).

DNA that matched Petitioner's DNA and DNA that matched Ms. McCollough's DNA from the sample taken from the outside of the condom.  (*Id*. at pp. 124-31.)

The Petitioner called four witnesses.  One of Petitioner's brothers, Lamario Bowden, and one of his cousins, David Fort, testified that, during the months preceding the incident at the Best Western, they had seen Petitioner and Ms. McCullough interacting in ways that suggested a relationship other than brother/sister.  By way of example, Lamario Bowden had seen Petitioner and Ms. McCullough together leaving a bedroom in Petitioner's mother's house.  (TT V, ECF No. 19, p. 12.)  He had seen Ms. McCullough on Petitioner's lap on the porch of the same house.  (*Id*. at p. 16.)  He had also seen Ms. McCullough with Petitioner in Petitioner's car.  (*Id*.)

Mr. Fort also testified that he had seen Ms. McCullough on Petitioner's lap.  (*Id*. at p. 52.) He testified that the two were in his apartment on the couch one time and, when Mr. Fort came into the room, it appeared that Petitioner's pants were "undid."  (*Id*.)  He also indicated he had seen the two kissing on Petitioner's mother's porch.  (*Id*. at p. 71.)  Petitioner's neighbor's cousin, Yolanda Anderson, testified that she had seen Petitioner on the porch "kissing and sitting on laps and playing, being flirtatious and stuff like that." (*Id*. at p. 91.)  Although she answered in the affirmative to the prosecutor's question: "[Y]ou don't know who Takesia McCullough is and you hardly know the Defendant?"  (*Id*. at p. 94.)

Petitioner closed his proofs with the testimony of his brother, Dionte Bowden.  Dionte Bowden's testimony also suggested a physicality that belied a brother/sister relationship between Ms. McCullough and Petitioner.  He believed he had interrupted something between Petitioner and Ms. McCullough when he entered the third floor room during the afternoon of June 8.  (*Id*. at pp. 106-09.)  He testified that Petitioner and Ms. McCullough never stopped touching each other when they were in the pool

together.  (*Id.* at p. 110-11.)  Mr. Bowden testified that, despite that appearance of a relationship between

Petitioner and Ms. McCullough, she jumped into the shower with Dionte Bowden in the second floor room

later that evening.  (*Id.* at pp. 114-15.)  They kissed and touched each other in the shower for fifteen to

twenty minutes.  (*Id.* at pp. 115-16.)  They moved to the bed, but when Mr. Bowden reached for a

condom, Ms. McCullough objected. (*Id.* at p. 116.)  Mr. Bowden reported that Ms. McCullough stated

that she would not have intercourse with him because she had had intercourse with his brother.  (*Id.*)

Mr. Bowden generally confirmed the testimony of the other witnesses with respect to the

drinking in the third floor room and bringing Ms. McCullough down to the second floor room when she was

very visibly drunk.  (*Id.* at pp. 121-31.)  After that point, however, there were differences between Mr.

Bowden's testimony and what appeared on the surveillance tapes.  Mr. Bowden's testimony sometimes

changed when he was confronted with the prosecutor's representation of what the video had shown. (*Id.*

at p. 176.)  But sometimes he insisted the prosecutor's characterization must be wrong.  (*Id.* at pp. 167-69,

190-92.)  Mr. Bowden indicated that once they returned Ms. McCullough to the third floor room, he left

the hotel.  (*Id.* at p. 196.)

The prosecution put on one rebuttal witness, detective Brian Beauchamp of the Kalamazoo

public safety department.  Detective Beauchamp testified regarding his interview with Dionte Bowden on

the afternoon of June 9, 2008.  (*Id.* at pp. 210-18.)

Closing arguments and instructions were given the following day.  (TT VI, ECF No. 20.)

The jury deliberated that afternoon and most of the next day.  (TT VI and VII, ECF Nos. 20, 21.)  They

returned a verdict of guilty on the first count of first-degree criminal sexual conduct and not guilty on the second count.[4]  (TT VII, ECF No. 21, p. 10.)

**B.       Direct Appeal**

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on February 3, 2011, raised the same six issues he raises in the instant petition.  (*See* Def.-Appellant's Br. on Appeal, ECF No. 23.)  By unpublished opinion issued on December 13, 2011, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's sentences.  (*See* Mich. Ct. App. Opinion, hereinafter "MCAO," ECF No. 23.)

On March 6, 2012, Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court.  (Application, ECF No. 24.)  Petitioner raised the same six issues raised before and rejected by the Michigan Court of Appeals.  By order entered July 24, 2012, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See* Mich. Ord., ECF No. 24.)

On May 9, 2013, Petitioner commenced this action.

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001).  The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically

---

[4]Petitioner argued the prosecution had failed to carry its burden on the second count (penile/anal penetration) because Nurse Cochran's testimony suggested that the DNA sample on the  "rectal swab" may not have been taken from rectum, but from the area exterior to the anal opening; thus, the prosecutor had failed to demonstrate penetration.

changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 132 S. Ct. 38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case

differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 2015 WL 1400852, at *3 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

## Discussion

### A.     Juror bias

Petitioner argues that he was denied a fair and impartial jury. During *voir dire*, one of the jurors, Mr. Devenney, disclosed that his ex-wife was a Kalamazoo police officer and that he knew several officers, including Brian Beauchamp, who testified as part of the prosecution's rebuttal case. (TT II, ECF No. 16, pp. 116-24; 127-28.) Petitioner contends that Mr. Devenny's relationship with Detective

Beauchamp rendered Mr. Devenney biased. (Petitioner's Brief, ECF No. 4. PageID.57.) According to Petitioner: "[Mr. Devenney] indicated that he would find Detective Beauchamp credible even if he were to say that the building was surrounded by pink helium balloons, and that because of his friendship with Beauchamp it would be difficult for [Mr. Devenney] to find him not credible." (*Id*.)[5]

The Michigan Court of Appeals resolved Petitioner's challenge of juror bias as follows:

A criminal defendant has a constitutional right to be tried by a fair and impartial jury. Jurors are presumptively competent and impartial, and the party alleging disqualification for bias bears the burden of proving its existence. A prospective juror may be removed for cause if the challenging party shows that the juror has a bias against a party or an attorney, the juror has a state of mind that will prevent him from rendering a just verdict, or if the juror has opinions that would improperly influence the juror's verdict. This Court generally presumes that a juror's representation that he is able to set aside any personal bias is sufficient to protect a defendant's right to a fair trial.

During voir dire, the juror at issue stated that he could not take something as true merely because the officer with whom he was acquainted had testified to it, but instead that he would "keep an open mind," treat police witnesses as "any other witness" and evaluate the believability of testimony after it was offered. The juror also commented that the officer was not more credible than defendant because neither had yet testified. Moreover, the juror expressly agreed to follow the court's instructions, without regard to his personal relationships with his ex-wife, who is a Kalamazoo police sergeant, and the other police officers with whom he had socialized. The juror's representations to the court that he could impartially judge testimony offered by the officer, and his disavowal of any prejudice for the prosecution or against defendant, was sufficient to protect defendant's right to a fair trial.

---

[5] Petitioner's reading of the transcript could not be more inaccurate. During *voir dire* Mr. Devenney explained that because of his relationship with Detective Beauchamp, he found Detective Beauchamp to have a credible character. (TT II, ECF No. 16, p.121.) Mr. Devenney elaborated, however, that his friend's character for credibility did not mean that Mr. Devenney would take everything his friend said as credible: "What he actually says when he's here, that goes beyond what I find of his character to be credible. I mean, if he were to step up there and tell me that the building is surrounded by pink helium balloons, I would find difficulty with the credibility of that statement." (*Id*.) Mr. Devenney expressly stated that he could find that his friend was not credible. (*Id*. at p. 122.)

(MCAO, ECF No. 23, p. 2 (citations omitted).)[6]

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury. . . ." U.S. Const. amend. VI. The right to an impartial jury is applicable to the states via the Fourteenth Amendment. *See Turner v. Louisiana*, 379 U.S. 466, 471-72 (1965); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Further, "due process alone has long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment." *Morgan v. Illinois*, 504 U.S. 719, 727 (1992) (citations omitted). "The *voir dire* is designed '"to protect [this] right by exposing possible biases, both known and unknown, on the part of potential jurors."'" *Dennis v. Mitchell*, 354 F.3d 511, 520 (6th Cir. 2003) (quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984)). When a juror's impartiality is called into question, the relevant issue is "'did [the] juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality be believed.'" *Dennis*, 354 F.3d at 520 (quoting *Patton v. Yount*, 467 U.S. 1025, 1036 (1984)).

The question of bias of an individual juror at a state criminal trial is one of fact. *Dennis*, 354 F.3d at 520 (citing *Patton v. Yount,* 467 U.S. 1025, 1036 (1984)); *see also Sizemore v. Fletcher,*

---

[6]Before reaching the merits of Petitioner's claim of juror bias, the Michigan Court of Appeals found that Petitioner failed to properly preserve his claim at trial. (MCAO, ECF No. 23, p. 2.) Nevertheless, the court of appeals found that Petitioner failed to demonstrate that the challenged juror was biased. *Id.* Petitioner's failure to make a contemporaneous objection caused him to default his claim in the state court. *See Wainwright, v. Sykes*, 433 U.S. 72, 86-88 (1977) However, when the claim clearly is without merit, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default. *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)).

921 F.2d 667, 672-73 (6th Cir. 1990) (citing *Smith v. Phillips*, 455 U.S. 209, 218 (1982)).  A state court decision based on a factual determination will not be overturned on factual grounds unless it was objectively unreasonable in light of the evidence presented in the state court proceeding and not simply erroneous or incorrect.  *Keith v. Mitchell,* 455 F.3d 662, 669 (6th Cir. 2006) (citing *Williams,* 529 U.S. at 409-11); *see also Young v. Hofbauer,* 52 F. App'x 234, 237 (6th Cir. 2002).  The state court's factual determination is entitled to a presumption of correctness, which is rebuttable only by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

According to the Michigan Court of Appeals, the record showed that the juror had agreed to set aside bias.  That court found the juror's statement of impartiality to be credible.  To counter that finding, Petitioner offers only the "pink helium balloon" comment.  That is certainly not clear and convincing evidence of the Mr. Devenney's bias.  Instead, it supports the Michigan Court of Appeals' determination that Mr. Devenney could set aside any prejudice in deciding Petitioner's case.  Petitioner has failed to establish that the state court's determination of his juror bias claim is contrary to or an unreasonable application of clearly established federal law.

## B.    Improper admission of evidence

In Petitioner's habeas issues II (testimony regarding the cause of victim's vaginal tear), III (more prejudicial than probative hotel surveillance tapes), IV (police testimony regarding statements by victim), and V (police testimony regarding discovery that Petitioner was a suspect), he challenges the trial court's admission of evidence.  The extraordinary remedy of habeas corpus lies only for a violation of the Constitution.  28 U.S.C. '2254(a).  As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no

part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552 (6th Cir. 2000).

Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently. The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000). Petitioner has not met this difficult standard.

### 1.    Testimony regarding the cut at the vaginal opening

During questioning by the prosecutor, registered nurse Rose Cochran testified as follows:

A    . . . on the inside by the vaginal opening towards the bottom there was a small cut.

Q    When you say towards the bottom are you talking the posterior or towards the anal opening?

A    Yes.

Q     Okay.  So there was a cut inside of Takesia McCullough's vagina.

A     Yes.

Q     Um, is this a cut that you would normally see by somebody just on the exterior of a vagina.

A.    No.

Q     What would be a typical explanation as to how that type of a cut would get inside the vagina?

A     Some kind of trauma or injury there.

Q     Okay.  Is this type of cut that you saw on Takesia McCollough, is this something that could have been caused by her using the restroom and wiping her–wiping after using the restroom?

A     No.

Q     Is this the type of injury that could have been caused by Takesia just, you know, rubbing herself, rubbing her vagina?

A     No.

Q     Is this the type of injury that could have been caused by either intercourse or digital penetration?

A     Yes.

Q     Is this consistent with a –like a trauma, a blunt force trauma of intercourse?

A     Yes.

(TT III, ECF No. 17, pp. 188-89.)

          Petitioner contends that by this testimony, Nurse Cochran testified that sexual intercourse

had been accomplished with Takesia by means of force.  Petitioner argues that Nurse Cochran's testimony,

if believed, mandates a determination that the cut was the result of criminal assault instead of the non-

criminal act of consensual intercourse.  The Michigan Court of Appeals resolved Petitioner's challenges as follows:

Defendant first objects that the nurse was not qualified as an expert before proffering the challenged testimony.  However, the nurse was not testifying as an expert witness; she was testifying as a fact witness to her observations of the victim's condition at the hospital.  In that context, as a lay witness, the nurse offered opinion testimony within the permissible confines of MRE 701, which allows a witness to testify "in the form of opinions or inferences . . . which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witnesses' testimony of the determination of a fact in issue."  To the extent that the nurse offered opinion or inferential testimony, it was rationally based on her perceptions of the victim's physical condition; it did not purport to be based on any "scientific, technical or other specialized knowledge" possessed by an expert.  Thus, there was no need to qualify the nurse as an expert witness.

As for the substance of the nurse's testimony, defendant points to *People v Beckley*, 456 NW2d 391 (1990), in which our Supreme Court held that an expert witness may not testify that sexual abuse occurred or that the defendant is guilty, and may not vouch for the veracity of the victim, as supporting a conclusion that the nurse's testimony was impermissible.  Setting aside that the nurse did not testify as an expert, the nurse's testimony did not purport to be dispositive as to whether a sexual assault occurred.  Rather, she testified as to potential instrumentalities of causation of the victim's injury, which could include blunt force trauma; at most, her testimony was that the injury was "consistent with" forcible sexual intercourse.  She did not offer any opinion as to whether the victim was sexually assaulted.  Accordingly, her testimony did not invade the jury's province of determining whether a sexual assault occurred.

Further, the challenged testimony was in no way dispositive as to whether defendant sexually assaulted the victim.  The jury was aware that another person was previously convicted of first degree sexual conduct committed against the victim.  Thus, defendant's assertion that he and the victim had consensual intercourse earlier in the afternoon, before the others arrived at the hotel, was not belied by the presence of the injury.  The nature of what happened to the victim was not at issue at trial – it was not disputed that she was sexually assaulted – the only question was defendant's role, if any, in that assault.  The nurse offered no testimony whatsoever bearing on resolution of this factual determination.  Consequently, defendant has not established plain error arising from the admission of the nurse's testimony.

- 18 -

(MCAO, ECF no. 23, pp. 3-4 (parallel citations omitted).)[7]   As revealed by the court of appeals'
resolution of Petitioner's claim (and, also, his brief in support of this petition), this claim is a state-law claim
not cognizable on habeas review.   Petitioner's attempt to shoehorn his claim into one cognizable here, by
claiming Nurse Cochran usurped the province of the jury, is factually unsupportable.   Nurse Cochran
offered no testimony regarding whether Petitioner sexually assaulted Ms. McCullough.

### 2.     The hotel surveillance video

Petitioner claims that it was error to admit the hotel surveillance videos because under
Michigan Rule of Evidence 401, they were not relevant.   Even if they were relevant, Petitioner argues, they
were more prejudicial than probative and, thus, inadmissible under Michigan Rule of Evidence 403.   To
bring this issue into the realm of habeas cognizability, Petitioner finally contends that the error was so
egregious that it violated his due process rights.

The Michigan Court of Appeals resolved these state-law issues as follows:

> Contrary to defendant's assertion, the surveillance recordings were relevant to
> establish the movement of people between two hotel rooms, to show the movement of the
> victim between the two rooms, and to demonstrate which members of the group were
> alone with the victim after she lost consciousness.   Further, the recordings corroborated
> the testimony of several witnesses regarding the course of the events, including testimony
> regarding the length of time it took defendant to respond to a knock on the door on the first
> occasion that he was alone with the victim.   The recordings certainly cast light on
> defendant's opportunity to sexually assault the victim, establishing beyond refute that he
> was alone with the victim on two separate opportunities after she lost consciousness.   The
> recordings were "of consequence to the determination of the action" and they made "a fact
> of consequence more or less probable than it would be without" their admission into
> evidence.   *People v Mills*, 537 N.W. 2d 909 (1995).   Therefore, it cannot be said that
> the recordings were not relevant.

---

[7]Again, Petitioner had failed to preserve this issue for appellate review by raising a contemporaneous objection.
This Court will look beyond the procedural default to resolve the claim on its merits.   *See* note 5, *infra*.

MRE 403 permits relevant evidence to by "excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." However, evidence is not unfairly prejudicial simply because it is damaging to the defendant's position at trial; all relevant evidence will be damaging to the extent it tends to prove that the defendant is guilty of the charged offense. *People v Houston*, 683 N.W. 2d 192 (2004). Unfair prejudice is "an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one." *People v Vasher*, 537 NW2d 168 (1995).

*     *     *

The recordings at issue were taken by cameras mounted at the opposite end of the hallway from the rooms rented by members of the group. Thus, while persons are identifiable, primarily by their clothing, they appear at a distance in the recordings. And, the victim appears for less than four of the 278 minutes spanned by the recordings, nearly half of which time she is somewhat ambulatory; it is apparent that she is being carried during her later appearances. The victim is, on all occasions in the recordings, fully clothed. There is nothing about the manner in which she is treated during her appearances in the recordings that would generate undue sympathy toward her, or outrage toward those with her. Having reviewed the surveillance recordings, we conclude that the trial court did not abuse its discretion by admitting this evidence at trial.

(MCAO, ECF No. 23, pp. 4-5 (parallel citations omitted).) "[I]t is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Estelle,* 502 U.S. at 67-68. Moreover, whether or not the admission of the surveillance tapes violated state law, the court of appeals' conclusion that the evidence was not unduly prejudicial to Petitioner is not an unreasonable determination on this record and precludes any determination that its admission was so egregious that it violated his due process rights.

### 3.     Police testimony regarding the victim's reaction

Detective Ellis testified that when Ms. McCullough awoke at the hospital, she adamantly maintained that she did not have sexual intercourse nor had she consented to have sexual intercourse with any of the individuals at the hotel. Petitioner objected to this testimony as hearsay. The trial court

overruled the objection after the prosecutor laid a foundation for the statement as an excited utterance.  The Michigan Court of Appeals affirmed the admission of the evidence: "On this record, we conclude that the trial court did not abuse its discretion by permitting the detective to testify to statements made by the victim upon being informed that a medical examination revealed that she had engaged in sexual intercourse." (MCAO, ECF No. 23, p. 6 (citations omitted).)

Whether or not the Michigan Rules of Evidence would admit such statements under the "excited utterance" exception to the hearsay rule is purely an issue of state law and, thus, not cognizable on habeas review.  Although the admission of "testimonial" hearsay might implicate Petitioner's Confrontation Clause rights, that is not the case here, because the declarant, Ms. McCullough, testified at trial and was subjected to probing cross-examination.[8]  Nor can it be said that the admission of the evidence caused undue and egregious prejudice to Petitioner such that it might offend due process.  The evidence was wholly duplicative of Ms. McCullough's testimony.  Put simply, Petitioner's challenge raises no meritorious federal claim cognizable on habeas review.

4.     **Police testimony regarding the identification of Jawan Bowden as a suspect**

As Detective Ellis was describing her investigation to the jury, the prosecutor elicited the following testimony:

---

[8]The Confrontation Clause of the Sixth Amendment gives the accused the right "to be confronted with the witnesses against him."  U.S. CONST., Am. VI; *Pointer v. Texas*, 380 U.S. 400, 403-05 (1965).  The clause provides "'two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination.'" *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987).  Petitioner enjoyed both those protections here.

Q    As a result of your investigation with regard to Sam Dixison the third, um, were you aware that he had implicated or acknowledged that other suspects or other individuals were involved in his crime?

A    Yes I was.

Q    And was one of those individuals identified as Jawan Bowden?

A    Yes.

(TT IV, ECF No. 18, p. 156.)  Petitioner objected to the statement as hearsay.  (*Id.*)  The prosecutor indicated that he was not offering the testimony for the truth of the matter asserted.  (*Id.*)  Indeed, he noted he was not asking Detective Ellis to recount any statement by Sam Dixison at all; instead, he was asking whether, as a result of the investigation, Jawan Bowden was a potential suspect.  (*Id.*)  The court overruled the objection on the ground that the prosecutor was not seeking the statement for the truth of the matter asserted but was rather looking for an explanation of what the witness was doing, the course of the investigation.  (*Id.* at 156-57.)

Petitioner contends that the trial court was wrong on the state law determination that the statements were not hearsay and, because the statements were hearsay and Mr. Dixison did not testify, the prosecutor violated Petitioner's rights under the Confrontation Clause.  The Michigan Court of Appeals rejected both propositions.  First the court of appeals agreed that the evidence admitted was not hearsay: "The detective did not testify to any out-of-court statement made by the other suspect and the testimony was not offered for the truth of any assertion by that suspect." (MCOA, ECF No. 23, p. 7.)  With respect to the Confrontation Clause challenge the court of appeals stated: "the detective's testimony did not contain hearsay; she did not testify to any testimonial statement and the objected-to testimony was not offered to prove that defendant was involved in the sexual assault."  (*Id.*)

- 22 -

This Court must accept the state court's determination of state law that the testimony was not hearsay. That determination further establishes that Mr. Dixison is not a "witness" whom Petitioner is entitled to confront.[9]   Petitioner's claims with respect to the detective's testimony are without merit.

## C.    Scoring of sentencing variables

Petitioner challenges his sentence on the ground that the trial court improperly scored several variables used to compute Petitioner's sentence under the Michigan Sentencing Guidelines. The Michigan Court of Appeals affirmed the trial court's scoring of the variables. There is no constitutional right to individualized sentencing in non-capital cases. *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991); *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995); *see also Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978) (in a case holding that mitigating factors must be fully considered in death penalty cases, the Court "recognize[d] that, in noncapital cases, the established practice of individualized sentences rests not on constitutional commands, but on public policy enacted into statutes."). Since Petitioner has no federal right to an individualized sentence, this ground presents an issue of state law only. Petitioner has not alleged grounds for the Court to conclude that this is one of those rare instances where an alleged state-law sentencing error was so egregious that it led to a fundamentally unfair outcome. *See Koras v. Robinson,* 123 F. App'x 207, 213 (6th Cir. 2005) (citing *Bowling v. Parker*, 344 F.3d 487, 521 (6th Cir. 2003)).

---

[9]Since the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004), the Court has "labored to flesh out what it means for a statement to be 'testimonial'" such that its introduction would implicate Confrontation Clause protection. *Ohio v. Clark*, 135 S. Ct. 2173, 2179 (2015). "In *Crawford* . . . [the Court] defined 'testimony' as 'a solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Id.* (citing *Crawford*, 541 U.S. at 51). The state court's conclusions that Detective Ellis did not "testify to any out-of-court statement" and that the "objected-to testimony was not offered to prove that defendant was involved in the sexual assault" stand as insurmountable obstacles to Petitioner's argument that because of Detective Ellis' testimony Mr. Dixison was an unconfronted, "out of court," witness against Petitioner.

### D. Ineffective assistance of counsel

With respect to Petitioner's habeas issue I, Petitioner failed to make a contemporaneous objection at trial. To excuse that failure, he contends that his counsel rendered constitutionally ineffective assistance. In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

In *Holder v. Palmer*, 588 F. 3d 328 (6th Cir. 2009), the Court considered an ineffective assistance claim premised on an attorney's failure to strike a "biased" juror:

> Because petitioner's claim for ineffective assistance of counsel is based on his trial counsel's failure to strike the allegedly biased jurors, petitioner must show that the jurors were actually biased against him. *Hughes*, 258 F.3d at 458. Holder must show through a review of *voir dire* testimony that a "fair trial was impossible." *Ritchie v. Rogers*, 313 F.3d 948, 952 (6th Cir.2002). "A juror's express doubt as to her own impartiality on *voir dire* does not necessarily entail a finding of actual bias. The Supreme Court has upheld the impaneling of jurors who had doubted, or disclaimed outright, their own impartiality on *voir dire*." *Hughes*, 258 F.3d at 458; *see also Patton*, 467 U.S. at 1025, 104 S.Ct. 2885. Bias in this context is "actual bias, or bias in fact: the existence of a state of mind that leads to an inference that the person will not act with impartiality." *Hughes*, 258 3d at 463.

*Holder*, 588 F.3d at 339-40. Petitioner has failed to make any showing of actual bias. *See* A., *infra.*

- 24 -

## Conclusion

In light of the foregoing, the Court will deny Petitioner's application because it fails to raise a meritorious federal claim.

## Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's denial of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability.

A Judgment and Order consistent with this Opinion will be entered.


Dated:   August 12, 2016                    /s/ Paul L. Maloney
                                             Paul L. Maloney
                                             United States District Judge